UNITED STATES of America, for the Use of POTOMAC RIGGING COMPANY, a Virginia corporation,

v.

WRIGHT CONTRACTING COMPANY, a Georgia corporation, and American Surety Company of N. Y., a New York corporation.

No. 11772.

United States District Court
D. Maryland,
Civil Division.
May 11, 1961.

Milton Seidenman, Baltimore, Md., Sidney S. Sachs (Sachs & Jacobs) Newton Frohlich, Washington, D. C., for plaintiff.

C. Edward Hartman, II (Fell & Hartman) Annapolis, Md., Tom B. Slade, Columbus, Ga., for defendants.

CHESNUT, District Judge.

This is a suit under the Miller Act (40 U.S.C.A. §§ 270a and 270b) which provides:

"§ 270a. Bonds of contractors for public buildings or works; waiver of bonds covering contract performed in foreign country

"(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, * * *.

"(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person. * * *."

"§ 270b. Same; rights of persons furnishing labor or material

"(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: *Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, * * *".

On December 16, 1957 the Wright Company, a Georgia corporation, entered into a contract with the United States Government (Department of the Interior) for the construction of certain highway work on the George Washington

Memorial Parkway in Montgomery County, Maryland, in the amount of $1,037,235. The contract, among many provisions, required the construction in connection with retaining walls or abutments for the roadway, of a certain amount of "cribbing" consisting of precast concrete. On April 16, 1958 the contractor by written order purchased this cribbing from the Prestressed Structures, Inc. The order required that the cribbing should be delivered at or near the job site at the "truck site" promptly as required. In due course it was all delivered and was fully paid for by the Wright Company to the Prestressed Company. In order to make the deliveries as required by the purchase order, Prestressed employed the Potomac Rigging Company, a trucker, to transport the cribbing from the Prestressed plant to the truck site. In due course Potomac Rigging Company, the plaintiff in this case, rendered bills for hauling services from time to time to Prestressed; but these bills were not paid by Prestressed before the latter went into voluntary liquidation and so notified the Potomac Company on January 16, 1959. Thereafter, about March 3, 1959 Potomac, not having been paid by Prestressed, notified Wright that it claimed payment from it as the prime contractor in the amount of $1252.45, and now alleges that the last of the deliveries was within 90 days before the receipt of said notice.

The principal and the critical point to be decided is whether, in all the circumstances of the case, the Prestressed Company can properly be considered as a subcontractor or was only a supplier of materials. As there was no direct contractual relationship between the use plaintiff and the Wright Company it is apparent at once that the case is governed by the proviso in section 270b(a) above quoted. In the case of MacEvoy Co. v. United States, 1944, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163, it was held by the Supreme Court in construing and applying this proviso that, as the statute does not in itself define what con-

stitutes a subcontractor (as compared with a material supplier) the meaning of the term must be found in the usage of the trade.

The important facts and circumstances are these:

1. It is not disputed that to warrant a recovery in this case the plaintiff has the burden of proof to show (a) that Prestressed was a subcontractor and not only a material supplier and (b) that the notice from Potomac to Wright was within 90 days after the last delivery of cribbing. As the Potomac Company had no contractual relations with the Wright Company and its relation to the matter was limited to mere transportation of the cribbing from Prestressed to the truck site, it cannot recover in this case even if it gave the required notice within 90 days unless it can show that the transportation it performed was for a "subcontractor" of the Wright Company. That is to say, the plaintiff's right to recover in this case depends upon the status of Prestressed, whether a subcontractor or merely a material supplier.

2. The total amount to be paid by the Government to Wright for the work to be done was $1,037,235. The amount paid by Wright to Prestressed was $13,936.16. All of the latter had been paid by Wright long prior to the notice from Potomac to Wright.

3. Prestressed was not asked by Wright to furnish a payment bond or any security for the full performance of the obligation under the accepted purchase contract.

4. In Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, (Defendant's Exhibit No. 1, page 19), it is stated:

"Section 8—Prosecution and Progress Article 8.1  Subcontracting.

* * * No portion of the contract shall be sublet except with the written consent of the engineer. Requests for permission to sublet any portion of the contract shall be in writing and accompanied by a showing that the organiza-

tion that will perform the work is particularly experienced and equipped for the work. Written consent to sublet any portion of the contract shall not be construed to relieve the contractor of any of his responsibility under the contract."

On page 3, Article 1.2, a subcontractor is defined as—"Any individual, firm, or corporation to whom the contractor, with the written consent of the engineer, sublets any part of the contract."

No request was ever made by Wright for approval of Prestressed as a subcontractor and the evidence does not show that the Government, by its engineer, approved Prestressed as a subcontractor.

5. The contract for the work (page D.5) provides with respect to the cribbing separately between the "materials" constituting it and the construction of the cribbing on the site of the work. The purchase order from Wright to Prestressed did not require any construction by Prestressed on the roadway and Prestressed did not perform any construction work on the roadway with respect to the cribbing or any other work of any kind on the roadway. The Potomac Company, whose only relation to the contract was to haul the material to the "truck site" when ordered from time to time by telephone by Prestressed, did not perform any work of any kind on the job; and indeed I find on the evidence that the trucks bringing the material to the job site were in fact unloaded by employees of the Wright Company and not by Potomac.

6. In Government contracts of this nature it is generally required that subcontractors must submit periodically certified copies of their payrolls. Prestressed was never asked to and did not submit any such payroll data to either Wright or the Government engineers.

7. In Prestressed's proposal to supply the cribbing material for a certain price it was expressly stated that Wright would be obliged to pay in addition to the calculated total price, a Maryland sales tax of 2%.

8. The sales agreement between Prestressed and Wright was not in the general and customary form of what is understood by a subcontract. The offer by Prestressed to furnish the cribbing in accordance with the Government specifications and plans, and the purchase order by Wright to Prestressed was not, I think, in the form generally used for the letting of a subcontract. Prestressed's offer was to furnish the cribbing and required payment on the basis of monthly requisitions for material delivered.

9. The plaintiff Potomac relies on the reference in Prestressed's offer to the description of the material to be furnished as contained in the specifications; but I find from the evidence that in orders for material required by Government specifications it is necessary that the materials incorporated into the job by the prime contractor must, of course, conform to the specifications and therefore the reference to the specifications in the proposal and purchase order is merely descriptive of what is to be furnished. Such a description is necessary whether the supplier is a subcontractor or only a material supplier. It does not of itself make the supplier a subcontractor.

10. In the usage of the business there is a marked difference between a subcontractor and a material supplier with respect to payments by the prime contractor. Where the owner for whom the work is to be performed under the contract is a Governmental Agency, either federal or state, it is usual and customary to make payments to the prime contractor on the basis of an estimate by the owner's engineer as to the percentage of the whole work that has been satisfactorily performed; and where the prime contractor deals with a subcontractor similar proportionate payments are made by the prime contractor to the subcontractor. Very generally ten per cent. of the whole contract or subcontract price is retained pending final completion. But in the case of a material man there is no such protection to the

prime contractor who is obliged under the statute to pay a material man within 90 days. In the instant case Prestressed was wholly paid for the cribbing long before the last of it was delivered. And in the case of a true subcontract the prime contractor can and frequently does require the subcontractor to furnish a payment bond to insure the payment of all claims for labor and material under the subcontract. No such bond was required or given by Prestressed.

11. As stated in the MacEvoy case, supra, a subcontractor is defined in this way [322 U.S. 102, 64 S.Ct. 894]: " * * * one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and material men." As I understand it, the effect of a real subcontract is to substitute his responsibility for his part of the work for the prime responsibility of the prime contractor. It does not appear in this case that the purchase agreement between Wright and Prestressed was to accomplish this shift of prime responsibility.

■ 12. In the MacEvoy case, after calling attention to the somewhat uncertain and indiscriminate use of the term "subcontractor" or "material supplier" as shown in Congressional hearings prior to the enactment of sections 270a and 270b, it was held by the court that in accordance with the intention of Congress the term "subcontract" should not be considered in its merely generic meaning of "any contract"; but that to give force and effect to the proviso of 270b (a), its meaning was to be taken in a technical sense, that is, according to the usage and understanding of the building construction industry. In the instant case we have a very full explanation by a qualified witness of broad practical experience which states clearly that in the industry a supplier of materials, such as Prestressed in this case, is not considered a subcontractor but a material supplier. Reference should be made for a fuller statement of the business usage

and the reasons therefor to the testimony of a Mr. Savage, who was the field manager for the Wright Company, with regard to the construction work in the instant case. Counsel for the plaintiff criticizes his testimony because of his interest in the matter. That, however, goes only to the weight of his testimony which, taken as a whole and considering his possible interest in the outcome of the suit, not as personally affecting him directly but only by reason of his employment, seemed to me to be credible and trustworthy; and I find nothing of substance to the contrary in the evidence. Of course I would not think it sufficient to rely merely on the ipse dixit of a defense witness as to the proper meaning of the term "subcontractor"; but in the testimony of this particular witness I find that the reasons that he gives for his opinion are themselves cogent and convincing and indeed quite in accordance with the Court's possibly only limited experience in these Miller Act cases.

■ The decision in this case must depend upon the proper understanding and application of the MacEvoy case. It is hardly necessary to say that the fairly lengthy opinion must be read and carefully considered as a whole, including also the particular helpfulness of the numerous footnotes which at times accent with apt discrimination the particular point of the text. Perhaps the two most outstanding points decided are (1) the distinction between the Miller Act, with particular reference to the proviso in section 270b(a), and the prior federal act known as the Heard Act which the Miller Act supplanted. Under the earlier Act there was indeed a broad sweeping generality of inclusion as beneficiaries of the one official bond required to be given in favor of a wide variety of persons who had contributed to the performance of the whole work by supplying labor or materials, whether material men or subcontractors, laborers, manufacturers, merchants or others. There was basis for the view, and at least some judicial support therefor, that

the protection of the bond covered any and all persons who had contributed to the work quite irrespective of the remoteness of their relationship to the prime contractor. It was this generality of the inclusive extent of the former Act which was one of the causes of difficulty or embarrassment to the persons engaged in the building and contracting industry. And it was to bring the coverage of the payment bond required by the Miller Act that the proviso was written in by Congress. The reasons for all this are stated in the opinion which, as I suggest, must be read as a whole. (2) The other very important holding in the case was this. The proviso did not itself define who is a subcontractor. The opinion of the court supplies this by interpretation and states that the distinction between a subcontractor and a material supplier must be that determined by the usage of the industry. In this case, possibly to a larger extent than in some of the decided cases as represented only by the opinions, it is possible that the record here includes more of the business customs and practices than in some other cases, and in my opinion the position of Prestressed was not that of a subcontractor.

I think the facts of this case bear a close analogy to the factual situation in the MacEvoy case as described in the opinion. In that case the prime contractor was MacEvoy. The work to be done was the erection of dwelling units of a housing project. Materials for the work were bought by MacEvoy from Miller and Miller procured some or all of these materials by purchase from Tompkins. The facts are expressed in the opinion as follows:

"MacEvoy * * * purchased from James H. Miller & Co., certain building materials for use in the prosecution of the work provided for in MacEvoy's contract with the Government. Miller in turn purchased these materials from the respondent, Calvin Tompkins Company. * * * There is no allegation that Miller agreed to perform or did perform any part of the work on the con-

struction project. Nor is it disputed that MacEvoy paid Miller in full for the materials." The court held that Miller was not a subcontractor and that Tompkins was not entitled to recover on Mac-Evoy's payment bond. It was apparently clearly accepted by the court that Miller was only a material supplier.

After much further discussion of the subject the court said at page 107 of 322 U.S., at page 894 of 64 S.Ct. "The proviso of Section [270b(a)] which had no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and subcontractors, who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act. Moreover, it would lead to the absurd result of requiring notice from persons in direct contractual relationship with a subcontractor but not from more remote claimants."

Counsel for the plaintiff here relies principally on two federal decisions. United States to Use of Hardware Products Corp. v. Johnson, D.C.W.D.Pa.1955, 137 F.Supp. 562, and Basich Bros. Construction Co. v. United States, 9 Cir., 1946, 159 F.2d 182. In the Johnson case Johnson was a prime contractor for a large building. He purchased the millwork, as described in the contract specifications, from the Illinois Valley Mfg. Company, which in turn purchased the doors of the millwork from the Hardwood Products Corporation. The opinion does not state whether the prime contractor paid the whole of the purchase price to the Illinois Company but later the Hardwood Company filed suit on the prime contractor's payment bond and the

court held on the allegations of the plaintiff that it was entitled to recover because in its opinion the Illinois Company was a subcontractor, and therefore overruled the motion to dismiss. The case was apparently decided only on a motion to dismiss the complaint. In overruling this motion the court based its opinion on a very small segment of the whole of the MacEvoy case in which it was stated that "a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and material men."

The whole of the complaint is not set out in the quite short opinion but I will assume for the purposes of this case that the ruling merely on the motion to dismiss was correct, in the absence of further details; but I cannot accept as sound the conclusion urged by plaintiff's counsel in the instant case that the ruling is applicable here where the decision is to be based not merely on the prima facie sufficiency of a complaint but on the whole record, including the customs of the business and many other facts and documents. And I suggest that the grounds for the decision may seem to have been based on a too literal application of a very limited portion of the whole opinion in the MacEvoy case. Compare the much fuller discussion of the MacEvoy case, as contained in a recent opinion of this court by Chief Judge Thomsen, United States for use of Newport News, etc. v. Blount Bros. Construction Co., D.C.1958, 168 F.Supp. 407, with which I fully agree. See also Ryan v. Bethlehem Sparrows Point Shipyard, 4 Cir., 1953, 209 F.2d 53, making a distinction between a sales agreement and a subcontract and holding that the particular sales agreement did not constitute the vendor a subcontractor, in a case arising under the Maryland Workman's Compensation Act, Code 1951, art. 101, § 63; and see Noland Company v. Allied Contractors, Inc., 4 Cir., 1959, 273 F.2d 917, where the suit under the Miller Act was for materials supplied to one who was apparently admittedly a subcontractor.

In the Basich case the prime contractor was Basich Bros., the subcontractor was Duque & Frazzini, and the use plaintiffs in the case were truck drivers hired by Duque & Frazzini to haul gravel from their gravel site to their plant site. It was held that Duque & Frazzini were subcontractors but a close examination of the stated facts will show that the terms of the subcontract were very different in nature and effect from the mere purchase of materials. Among the terms were that the gravel to be supplied by Duque & Frazzini was to be determined under the direction and to the satisfaction of the principal's engineer, and also it is to be noted that the subcontract involved a payment in excess of $100,000 and contained a provision for renegotiation under 50 U.S.C.A.Appendix, § 1191 which provides for renegotiation of prices of subcontracts. In my opinion the facts of the Basich case are so materially different from the comparatively simple situation here involved that there is no fair comparison with the instant case; and particularly it is to be noted that the parties themselves impliedly considered and treated Duque & Frazzini as subcontractors.

On the whole evidence I find and conclude that the proper legal relationship of the Prestressed Company to the Wright Company was that of a supplier of materials and not a subcontractor.

For these reasons the use plaintiff, the Potomac Rigging Company, is not entitled to recover its claim of $1252.45 against the Wright Company even if the plaintiff has shown by a preponderance of the evidence that it gave the required notice to the Wright Company within 90 days after its last delivery of cribbing to the truck site of the Wright Company. But as counsel for the Wright Company contends that the proof in the case offered by the plaintiff is not sufficient to comply with this requirement of section 270b(a), I will briefly state my views on that point.

The notice referred to was by registered letter dated February 28, 1959, but the defendant states it was not actually mailed, according to the postmark, until March 2, 1959 and was received by the defendant on March 3, 1959. The latest date which was 90 days previous thereto, was December 3, 1958. At the first hearing of the case on April 6, 1961 the date of the latest delivery proven was November 7, 1958 (P.X.No.2 which shows a receipt for delivery on that date). As this was not sufficient compliance with requirements, counsel for the plaintiff requested more time to produce other evidence as to the date of the last delivery. This was granted by the court and the case came on for hearing again on May 3, 1961. At that time the plaintiff produced several witnesses, some who had been employees of the Prestressed Company, and others employees of the Potomac Rigging Company, in an attempt to prove the delivery on December 5, 1958, two days within the 90 days, and/or December 8, 1958. There was also produced a book of printed tickets for use in the business of the Potomac Company in respect to its custom of business. The ticket forms indicated a particular number and driver supplied by the Potomac Company and contained an itemized list of the quantity and weight of the load of cribbing. The customary routine was that each set of loading tickets contained a white sheet and two carbons, one pink and the other yellow. As the Potomac Company did a large part if not all of the hauling for Prestressed, several of these ticket forms were left for convenience with Mr. Dooley, a representative of Prestressed. The custom was for him on each occasion for which he had telephoned notices to the Potomac Company for a truck, to write out in his handwriting a description of the particular portions of the cribbing as to size and weight, to be transported on the particular occasion. After Dooley had done so he would hand the two carbons to the driver of the truck, one to be receipted by the representative of the Wright Company at the truck site, and returned to the office of the Potomac Company, and the other carbon copy to be given to and retained by the Wright Company. As to the order blank dated December 5, 1958, Mr. Dooley testified that the description of the cribbing thereon was in his handwriting. The truck driver whose name was stated thereon, however, has since died. There was testimony from Mr. Dooley of some nature with regard to a white ticket dated December 8, 1958 which was also in his handwriting, and he stated that he remembered that the driver whose name was thereon was one who had frequently come with a truck from the Potomac Company; but as I recall the testimony, Mr. Dooley did not precisely remember the particular occasion other than as inferred by him from his handwriting and the general custom of the business. The driver named in the white ticket for December 8, 1958 was Alvin Loos who testified that he had frequently driven trucks with loads picked up at the Prestressed Company and delivered them to the truck site of the Wright Company. He said also that sometimes he could not find any one at the truck site to receipt for the delivery. The further custom of the business was that after completion of the business between Prestressed and Potomac the white tickets were returned by Dooley to the Potomac Company. The plaintiff was not able to produce any receipt for delivery by the Wright Company after the one dated November 7, 1958, or possibly as I note in a book of tickets produced by counsel for the plaintiff but not clearly authenticated as to signatures of reported receipts, for November 28, 1958, both of which dates were more than 90 days prior to the notice. At the last hearing and on insufficient prior subpoenas duces tecum to the Wright Company to produce various books and documents, a representative of the Wright Company so summoned testified that he had made a diligent search for any receipted delivery ticket dated December 5, 1958 but could find none in the files of the Company. And as to the date of

December 8, 1958 then first brought to his attention, he had not had time between the receipt of the notice and his required attendance in court to look more thoroughly therefor. The plaintiff also relies on the entries made by a clerk or bookkeeper in its books with regard to charges for services on the statutory well-known shop-book rule as to evidence.

While the whole of this evidence with regard to the sufficiency of the notice is far from satisfactory, I accept it as sufficient prima facie proof in the absence of any positive testimony by the defendant to the contrary.

For the reasons herein stated the complaint must be and it is hereby this 11th day of May, 1961, *dismissed.* The Clerk is instructed to enter judgment for the defendant.